**MEHTA, Appellant and Cross–Appellee,**

v.

**OHIO UNIVERSITY, Appellee and Cross–Appellant.**

[Cite as *Mehta v. Ohio Univ.*, 194 Ohio App.3d 844, 2011-Ohio-3484.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–886.

Decided July 14, 2011.

846

The Gittes Law Group, Frederick M. Gittes, and Jeffrey P. Vardaro, for appellant and cross–appellee.

Michael DeWine, Attorney General, Randall W. Knutti, Principal Attorney, and Daniel R. Forsythe, Assistant Attorney General, for appellee and cross–appellant.

CONNOR, Judge.

{¶ 1} Plaintiff-appellant and cross-appellee, Bhavin Mehta, appeals from a judgment of the Court of Claims of Ohio in favor of defendant-appellee and cross-appellant, Ohio University ("OU"), on his claim for defamation after a bifurcated trial on the issue of liability. For the reasons that follow, we reverse in part the judgment of the trial court.

{¶ 2} The facts of this matter stem from a highly publicized plagiarism scandal that plagued the Russ College of Engineering and Technology at OU. At the time, Mehta was employed as an associate professor at Russ College and was the director of OU's Computer–Aided Design/Computer–Aided Manufacturing Laboratory. One of his responsibilities was to advise graduate students in their researching and writing of theses and dissertations.

{¶ 3} In July 2004, a mechanical engineering graduate student raised issue with what he perceived as plagiarism in portions of theses from within the Department of Mechanical Engineering in the Russ College. The allegations eventually reached the Dean of the Russ College, Richard Dennis Irwin, and the

Provost of OU, Kathy Krendl. The matters were referred to "judiciaries," the OU adjudicatory body responsible for adjudging allegations of academic misconduct of students. However, the judiciaries determined that the allegations primarily concerned former students who had long since left OU. Accordingly, the judiciaries believed that they lacked the authority to adjudge such allegations and referred the matters back to Irwin.

{¶ 4} Irwin approached Krendl and recommended that they establish an Academic Honesty Oversight Committee ("AHOC") to investigate the allegations. As a result, in November 2005, AHOC was established and was composed solely of department chairs from the various disciplines of engineering within the Russ College. AHOC was asked to determine whether plagiarism had occurred and to provide recommendations regarding the accountability of the students and the faculty.

{¶ 5} In the midst of AHOC's investigation, Krendl sought a perspective from outside the Russ College. Therefore, in February 2006, she created a two-person committee consisting of Gary Meyer and Hugh Bloemer. Neither individual had any affiliation with the Russ College. Nor did either individual have a background in engineering. Krendl chose Bloemer because she believed that he had expertise in faculty rights and responsibilities because he had previously served as the president of the faculty senate. He had also reviewed many theses over the course of his career, and the provost believed that he would be an expert at detecting plagiarism. Meyer was picked because of his background in intellectual property and his likely ability to understand the technical language presented in the theses at issue.

{¶ 6} On March 30, 2006, AHOC issued a report setting forth its recommendations. This report did not conclusively determine that plagiarism had, in fact, occurred.[1] It did, however, establish a series of guidelines to categorize the type and relative degree of alleged plagiarism in the theses and dissertations. First, when the originality of the student's technical contribution was called into question, AHOC considered this to be the most serious allegation, which it classified as "Category I violations." With regard to faculty accountability, AHOC recommended that any faculty members who had served as advisors on theses containing Category I violations should be referred to the Russ College's

---

1. There are inconsistencies as to when plagiarism was conclusively determined by AHOC. In its March 30, 2006 report, AHOC indicated: "After reviewing the materials supporting the allegations, the committee decided that in most cases plagiarism had been committed." However, the attachment to AHOC's March 30, 2006 report expressed the need to provide students with an opportunity to explain any duplication before a decision on the issue of plagiarism could be rendered. According to the record, AHOC had not reached a conclusive determination on the issue of plagiarism with regard to any of Mehta's advisees as of March 30, 2006.

ethics committee for review. However, according to AHOC, no Category I violations had been alleged.

{¶ 7} The AHOC report classified less-serious allegations as "Category II violations," in which the alleged plagiarism was limited to the introductory information that formed the foundation for the students' own research. Within AHOC's report was a spreadsheet listing 56 "offending documents" in which Category II violations had been alleged. The spreadsheet listed the advisor associated with each offending document. Of the 56 offending documents listed in the spreadsheet, appellant was listed as the advisor for 11 different theses. In fact, however, he served as the advisor for 12 of the 56 theses reviewed by AHOC. The AHOC report broke down the Category II violations into various subgroups based upon factors AHOC considered to be relevant. Specifically, AHOC considered whether the alleged plagiarism concerned published sources. It also considered the relative timing of theses and whether the students were at OU at the same time. It considered issues pertaining to self-plagiarism and student collaboration. Regardless of these factors, however, AHOC recommended that each student be provided with an opportunity to respond to the allegations before a determination on plagiarism could be made. AHOC did not recommend any action with regard to faculty accountability for Category II violations.

{¶ 8} Meyer and Bloemer received a copy of the AHOC report and continued their investigation. In late May 2006, Meyer and Bloemer provided a draft of their report ("the Meyer–Bloemer report") to Krendl and Irwin. Upon receiving the draft, Irwin approached Krendl and expressed concerns over what he classified as inflammatory and inappropriate content. He indicated that he would not support her in the event that she wished to release it to the media during a press conference that was scheduled for May 31, 2006. According to the provost, she approached Meyer and Bloemer and asked them to change the draft and tone down its content. They refused. Nevertheless, on May 31, 2006, Krendl held the press conference, during which she distributed the unaltered draft of the Meyer–Bloemer report to the media. It provided:

To: Dr. Kathy Krendl, Provost, Ohio University

From: Gary D. Meyer * * * and H. Hugh L. Bloemer * * *

Subject: Plagiarism in the Department of Mechanical Engineering in the Russ College of Engineering at Ohio University

We have assessed the issue of plagiarism in the above department over the past four months and we conclude that rampant and flagrant plagiarism has occurred in the graduate program of the Department of Mechanical Engineering for over twenty years. All members of the academic community, students and faculty alike, are responsible for the integrity and originality of their work.

According to the documents that we read and investigated, there are seven faculty members in the department who supervised theses where plagiarism was found. However, the vast majority of the cases revolve around three faculty members who either failed to monitor the writing in their advisees theses or simply ignored academic honesty, integrity and basically supported academic fraudulence. We consider this most serious.

There can never be a time or reason at an academic institution, such as our Ohio University, when plagiarism can be justified. Equally, there can not be any tolerance of the individuals who participate in this serious misconduct. The ad hoc committee of the college established some guidelines to mitigate the obvious problems but we do not concur that the problems are caused by the graduate students and subsequently it is up to the graduate students to remedy the situation. When a faculty member becomes the advisor/mentor of a graduate student, she/he automatically assumes the responsibilities to monitor the progress of the students as they advance to become professionals. Supervision of theses is part of the process. We are appalled that three members of the faculty in mechanical engineering have so blatantly chosen to ignore their responsibilities by contributing to an atmosphere of negligence toward issues of academic misconduct in their own department. We are amazed to see that the internal ad hoc committee recommended no reprimand for those individuals.

We recommend the following:

1) A lack of faculty oversight on theses work is of particular concern in relation to two faculty members in the Department who served as advisors in many of the theses included in this investigation. These two members' involvement in these issues should be referred to the College of Engineering Professional Ethics Committee, consistent with the Ohio University Faculty Handbook, for their deliberation and recommendations to the Dean of the College. We recommend that, consistent with Ohio University policy, you initiate the dismissal of the current chair of the department immediately, start the process of rescinding the title of Moss Professor and dismiss the Group II faculty member, who had the second highest incidences of plagiarism, 11 theses under his direction.

\* \* \*

10) We reviewed an additional 65 theses from 13 other disciplines across the campus based on similarities in titles (the same approach used to ascertain the problem in the Department of Mechanical Engineering). From this cursory review we conclude that this plagiarism issue is unique to the Department of Mechanical Engineering at Ohio University.

\* \* \*

13) Of the total 293 master theses completed in the department of Mechanical Engineering (according to the College's records), 106 or 36% were supervised by the two individuals who have been identified as the major contributors of the plagiarism problem in that department. All of these theses should be reviewed by the College to ascertain if additional theses contain plagiarism and, if so, they should be included and be subjected to the appropriate actions suggested by the college committee and the Provost.

14) Act swiftly to get this unacceptable conduct at Ohio University behind us and let us move forward with our noble mission of educating the future professional from poets to CEOs of the world.

"The highest courage is to dare to be yourself in the face of adversity. Choosing right over wrong, ethics over convenience, and truth over popularity * * * these are the choices that measure your life. Travel the path of integrity without looking back, for there is never a wrong time to do the right thing." (This quote came from a poster entitled: The Courage of Integrity.)

Although not specifically named within the report, Mehta was the only "Group II faculty member" employed in the Department of Mechanical Engineering at that time.

{¶ 9} After the Meyer–Bloemer report was released, Irwin provided a statement to a reporter for the Post, a publication in Athens, Ohio. He said that the faculty members referred to in the report were relieved of their advising responsibilities because they had contributed to a culture of academic dishonesty. In making this statement, Irwin specifically named Mehta as one of the faculty members. Based upon Irwin's statements, the Post released an article indicating that members of the faculty had contributed to a "culture of plagiarism."

{¶ 10} In late June 2006, the director of legal affairs at OU, John Burns, was interviewed by Kathy Lynn Gray, a reporter from the Columbus Dispatch. After the interview, the Dispatch published an article with the headline "OU Professor Leaves Post in Plagiarism Investigation." The article indicated that Mehta's contract with OU had not been renewed "in part because Mehta supervised theses identified as containing plagiarism."

{¶ 11} On October 24, 2006, Mehta filed the instant defamation action against OU based upon the Meyer–Bloemer report and the statements allegedly made by Burns and Irwin thereafter. The matter proceeded to a bench trial on the issue of OU's liability.

{¶ 12} During the trial, much of the testimony regarded the concept of plagiarism and its detection. As the writing director in the Department of Communication at the Rochester Institute of Technology, Patrick M. Scanlon testified as an expert in plagiarism on Mehta's behalf. He defined plagiarism as

the deliberate use or expression of someone else's ideas as though they were the author's own without proper attribution. He emphasized the critical importance of determining an author's intent before reaching a determination on the issue of plagiarism. He distinguished attribution errors from plagiarism by stating that improper attribution may result from ignorance or clumsiness. According to Scanlon, improper attribution does not rise to the level of plagiarism because the intent to deceive is lacking. As a result, Scanlon testified that duplication amongst documents does not necessarily mean that plagiarism has occurred. He indicated that a determination of plagiarism could not be made by merely looking at two documents side by side. Instead, he said that a determination could be made after speaking with the author. Similarly, he testified that it would be proper to speak with the advisor of a thesis before determining whether plagiarism should have been detected.

{¶ 13} Carlo Montemagno testified as an expert on OU's behalf. As the dean of the College of Engineering at the University of Cincinnati, Montemagno testified that he has established rules in place to ensure that faculty members are properly reviewing documents. He testified that the faculty is responsible for ensuring that material is of high quality and is not plagiarized, and he regularly reminds the faculty of this responsibility. In the event that the faculty fails to meet this responsibility, he has mechanisms in place for addressing such a failure. When Montemagno recognized possible instances of plagiarism in an advisee's thesis, he approached the student and sought explanations. He then explained to the student that it is inappropriate to plagiarize even in background information. He then suggested that the student rewrite the questionable material. He testified that the element of intent is required with regard to plagiarism, but that element is satisfied as soon as a student places his or her name on the document and represents it as his or her own work.

{¶ 14} Irwin testified that he provided certain instructions to Meyer and Bloemer at the outset of their investigation. According to Irwin, he told them that the presence of duplication did not necessarily equate to plagiarism. He allegedly also instructed them that the author of a "source document" might not have culpability in its subsequent use by the author of an alleged "offending document." According to his testimony, he instructed them on certain exceptions to the concept of plagiarism, including the ideas that common knowledge could explain duplication, collaboration amongst authors may be a form of self-plagiarism, and it is impossible to plagiarize from oneself.

{¶ 15} According to the testimony of Meyer and Bloemer, these individuals were asked to ascertain whether the allegations of plagiarism were true and to make recommendations accordingly. Neither individual had any knowledge of or training on the guidelines or standards for plagiarism or its detection. Further-

more, according to these individuals, OU never had guidelines or a definition of what it considered to be plagiarism. Nor was there any explanation of OU's expectations regarding a faculty member's responsibility to detect plagiarism. Instead, the OU faculty handbook indicated that members of the faculty were to impart the highest standards of academic honesty and integrity.

{¶ 16} According to Meyer, they had no working definition of plagiarism as they conducted their investigation. Meyer believed that each and every instance of duplication was plagiarism. He was unaware whether there was any distinction between plagiarism and improper attribution. Further, he could not recollect whether plagiarism required the intent to deceive on the part of the author. Bloemer believed that any and all unattributed duplication was plagiarism. Both individuals denied having ever received instructions from Irwin prior to conducting their investigation.

{¶ 17} According to their testimony, Meyer and Bloemer were presented with documents and reviewed them side by side to determine whether plagiarism had occurred. Although Mehta was the advisor on 12 of the 56 theses at issue, Meyer and Bloemer found only 11 instances of plagiarism in the theses they reviewed. They never spoke with any of the authors of the documents. They similarly never spoke with any of the advisors who had failed to detect the alleged plagiarism. At the conclusion of their investigation, Meyer and Bloemer destroyed all their notes and work product from the investigation.

{¶ 18} Krendl testified that she had instructed Meyer and Bloemer to independently review the allegations of plagiarism and provide an advisory report. At the time, she knew that issues about plagiarism and its detection were complex. According to the provost, she knew that a conclusion on plagiarism could not be made without first consulting an expert in the particular discipline. She knew that neither Bloemer nor Meyer were experts in mechanical engineering. Further, she knew that no conclusion on plagiarism could be made until after an author had had the chance to explain the questionable material. She testified that Meyer and Bloemer were not specifically instructed to interview students before issuing their report.

{¶ 19} Krendl testified that she did not expect the Meyer–Bloemer report to provide specific conclusions regarding specific individuals. According to the provost, the ethics committee was the proper authority to review allegations of misconduct on the part of a faculty member. Meyer and Bloemer never informed Krendl about the methodology or standards they used in reaching their conclusions. According to the provost, after she received a draft of the Meyer–Bloemer report, she approached Meyer and Bloemer and asked them to tone down the content. She indicated that after they allegedly refused, she felt compelled to release the report to the press because of an outstanding public-records request.

{¶ 20} Mehta testified that in supervising his advisees, he always emphasized the importance of properly crediting other individuals for their work. He told them that copying material verbatim was unacceptable unless special circumstances existed. According to Mehta, such circumstances included the collaboration on unpublished documents and instances when the material was common knowledge within a discipline.

{¶ 21} Mehta testified about the general process of receiving and reviewing theses. Usually, he received drafts of chapters and returned them to the advisee with recommended changes. According to Mehta, he sometimes questioned the citations or originality of the work of his advisees. In his review, he checked the bibliography to determine whether the citations were proper. However, he did not verify the content of the thesis against every citation by retrieving the articles and textbooks it cited. According to Mehta, this was not expected of the faculty at OU.

{¶ 22} Mehta testified that when he was satisfied with a completed draft of an entire thesis, the advisee was then required to defend the thesis before a committee of three or four faculty members. The advisor for the thesis served as the committee chair. The committee also included another faculty member who was familiar with the substance of the research area. According to Mehta, this individual was responsible for ensuring that the research was performed, was scholarly, and was sufficient to warrant the bestowment of a master's degree upon the author. The other member of the committee was from a different discipline and was usually responsible for procedural issues in the defense of the thesis.

{¶ 23} In January 2008, the trial court presided over a four-day bench trial and heard the foregoing testimony. On August 18, 2009, it entered judgment in favor of OU after finding that the alleged defamatory statements were opinions. Mehta has timely appealed and presents the following assignments of error:

**Assignment of Error No. 1:**

The trial court erred as a matter of law in holding that the defamatory statements at issue were statements of protected opinion and not fact.

**Assignment of Error No. 2:**

The trial court erred as a matter of law in holding that defamatory statements contained in public records are not actionable even when they are written for public consumption and then voluntarily disseminated to the media by public officials.

**Assignment of Error No. 3:**

The trial court made findings of fact that were manifestly against the weight of the evidence with respect to Dr. Mehta's monitoring of his students' work.

**Assignment of Error No. 4:**

The trial court made a finding of fact that was manifestly against the weight of the evidence with respect to whether or not OU's legal counsel made a defamatory statement to a newspaper reporter about the termination of Dr. Mehta's employment.

{¶ 24} For the sake of clarity, we will address appellant's assignments of error out of order. First, we will address appellant's first assignment of error, which challenges the trial court's conclusion that the statements were protected opinions. We will then consider appellant's fourth assignment of error, which challenges the evidentiary basis supporting the trial court's finding on the issue of whether Burns made a defamatory statement. We will then turn to appellant's third assignment of error, which regards the evidentiary support for other portions of the trial court's decision. Finally, we will address appellant's second assignment of error, which challenges the trial court's finding on the public-records issue.

## 1. Opinions versus Factual Statements

{¶ 25} By way of his first assignment of error, appellant challenges the trial court's conclusion that the statements at issue were constitutionally protected opinions.

{¶ 26} Defamation involves the publication of a false statement " 'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.' " *Jackson v. Columbus,* 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9, quoting *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council* (1995), 73 Ohio St.3d 1, 7, 651 N.E.2d 1283. The elements of defamation are " ' "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." ' " *Mallory v. Ohio Univ.* (2001), 10th Dist. No. 01AP–278, 2001 WL 1631329, *3, quoting *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Serv., Inc.* (1992), 81 Ohio App.3d 591, 601, 611 N.E.2d 955, quoting 3 Restatement (Second) of the Law (1977), 155, Section 558. "Slander" is defamation in its spoken form, while "libel" is written or printed. *Schmidt v. Northcoast Behavioral Healthcare,* 10th Dist. No. 10AP–565, 2011-Ohio-777, 2011 WL 598440, ¶ 8, citing *Matikas v. Univ. of Dayton,* 152 Ohio App.3d 514, 2003-Ohio-1852, 788 N.E.2d 1108, ¶ 27.

{¶ 27} The expression of an opinion is generally immune from liability under the Ohio Constitution and the United States Constitution. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182; see also *Wampler v. Higgins* (2001), 93 Ohio St.3d 111, 113, 752 N.E.2d 962. This is because " 'there is no such thing as a false idea.' " *Feldman v. Bahn* (C.A.7, 1993), 12 F.3d 730, 733, quoting *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 339, 94 S.Ct. 2997, 41 L.Ed.2d 789. However, " '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.' " Id. at 733, quoting *Rosenblatt v. Baer* (1966), 383 U.S. 75, 86, 86 S.Ct. 669, 15 L.Ed.2d 597. Therefore, what is required is a delicate balance between the constitutional protections afforded to the free expression of ideas and the protections afforded to an individual's reputation under defamation laws. *Fechko Excavating, Inc. v. Ohio Valley & S. States LECET,* 9th Dist. No. 09CA0006–M, 2009-Ohio-5155, 2009 WL 3119723, ¶ 19, citing *Old Dominion Branch No. 496, Natl. Assn. of Letter Carriers v. Austin* (1974), 418 U.S. 264, 270–272, 94 S.Ct. 2770, 41 L.Ed.2d 745.

{¶ 28} Again, the first element of a defamation claim is "that the defendant has asserted a false statement of fact, rather than just an opinion." *Rothschild v. Humility of Mary Health Partners,* 163 Ohio App.3d 751, 2005-Ohio-5481, 840 N.E.2d 258, ¶ 2. The fact-versus-opinion issue presents a question of law for a court to determine. *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 250, 25 OBR 302, 496 N.E.2d 699, citing *Ollman v. Evans* (C.A.D.C.1984), 750 F.2d 970, 978; *Rinsley v. Brandt* (C.A.10, 1983), 700 F.2d 1304, 1309; *Lewis v. Time Inc.* (C.A.9, 1983), 710 F.2d 549, 553; *Slawik v. News–Journal Co.* (Del.1981), 428 A.2d 15, 17. To answer this question, a court must determine whether a reasonable reader will perceive the statement as a fact or an opinion. *McKimm v. Ohio Elections Comm.* (2000), 89 Ohio St.3d 139, 144, 729 N.E.2d 364, citing *Vail,* 72 Ohio St.3d at 282–283, 649 N.E.2d 182; and *Scott* at 251–253. That is, "the law charges the author of an allegedly defamatory statement with the meaning that the reasonable reader attaches to [it,]" regardless of the author's subjective interpretation or intent. Id. at 145, citing 3 Restatement (Second) of the Law (1977), Torts, Section 563 ("The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express").

{¶ 29} With this backdrop, Ohio courts apply a totality-of-the-circumstances analysis and consider four factors in order to determine whether a statement is a fact or an opinion. *Scott,* 25 Ohio St.3d at 250, 25 OBR 302, 496 N.E.2d 699. More specifically, courts consider "the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared." *Vail,* 72 Ohio St.3d at 282,

649 N.E.2d 182. While each factor must be considered, the weight afforded to each varies based upon the circumstances presented in each case. Id. Therefore, the analysis should be fluid and flexible rather than strict and mechanistic. Id. Indeed, consideration of the factors should be used more like a compass to provide guidance rather than a map to establish rigid, delineated boundaries. *Scott* at 250.

## A. The Meyer–Bloemer Report

{¶ 30} First, we must consider the specific language used in the statements at issue. *Scott* at 250. In this regard, our focus is on "the common meaning ascribed to the words by an ordinary reader." *McKimm*, 89 Ohio St.3d at 144, 729 N.E.2d 364, fn. 2. A reasonable reader is "less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning." *Wampler*, 93 Ohio St.3d at 128, citing *Ollman*, 750 F.2d at 979. As a result, "statements that are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation." *Wampler* at 128, 752 N.E.2d 962, citing *Ollman* at 980.

{¶ 31} In filing this defamation claim, appellant alleges that the following language from the Meyer–Bloemer report is defamatory: "[F]aculty members who either failed to monitor the writing in their advisees' theses or simply ignored academic honesty, integrity and basically supported academic fraudulence." Appellant also challenges the statement indicating that faculty members "blatantly [chose] to ignore their responsibilities by contributing to an atmosphere of negligence toward issues of academic misconduct in their own department."

{¶ 32} With regard to the specific language of the Meyer–Bloemer report, the trial court held that ambiguity exists by the syntax of the statement that three faculty members "either failed to monitor" or "ignored academic honesty, integrity and basically supported academic fraudulence." Further, it held that the words "honesty," "integrity," and "fraudulence" have different meanings to different readers. Upon our review of the trial court's decision, we see no analysis pertaining to the second challenged statement from the Meyer–Bloemer report.

{¶ 33} On appeal, appellant argues that a reasonable reader would perceive the specific language as a factual assertion that appellant failed to perform his duties as an advisor. We agree.

{¶ 34} While there is no direct statement that appellant failed to perform his duties as an advisor, the clear impact of the specific language imparts this assertion. See *Scott*, 25 Ohio St.3d at 251, 25 OBR 302, 496 N.E.2d 699 (while

there is no express statement that the appellant had committed perjury, the clear impact of the specific language in nine sentences was that the appellant lied while under oath, which weighed in favor of actionability); see also *McKimm*, 89 Ohio St.3d at 145–146, 729 N.E.2d 364 (political cartoon depicting public official accepting money under the table was a clear accusation of bribery, which weighs in favor of actionability). We believe that a reasonable reader would perceive the specific language as an assertion that appellant failed to perform his duties as an advisor. That is, appellant either failed to perform his duties by failing to detect the plagiarism, or he failed to perform by detecting the plagiarism and ignoring it. Either way, what remains is the pejorative implication that appellant failed to perform his advisory duties. See *Lennon v. Cuyahoga Cty. Juvenile Court*, 8th Dist. No. 86651, 2006-Ohio-2587, 2006 WL 1428920, ¶ 30 (specific language weighed in favor of actionability because the court could not imagine a scenario where the words were not pejorative). This analysis applies equally to the specific language of the second challenged statement in the Meyer–Bloemer report. The specific language at issue weighs in favor of actionability.

{¶ 35} We next consider whether the statements of the Meyer–Bloemer report are verifiable. In this analysis, we must determine whether the defamatory statements may be objectively proven or disproven. *Wampler*, 93 Ohio St.3d at 129, 752 N.E.2d 962. The inquiry is whether "the author impl[ies] that he has first-hand knowledge that substantiates the opinions he asserts." *Vail*, 72 Ohio St.3d at 283, 649 N.E.2d 182. If such an implication is made, "the expression of opinion becomes as damaging as an assertion of fact." *Scott*, 25 Ohio St.3d at 251, 25 OBR 302, 496 N.E.2d 699, citing *Ollman*, 750 F.2d at 979. However, when a statement cannot be verified, "a reasonable reader will not believe that the statement has specific factual content." *Scott* at 251, 25 OBR 302, citing *Ollman* at 979.

{¶ 36} On this issue, the trial court held that the statements in the Meyer–Bloemer report are not verifiable because Bloemer had no first-hand knowledge as to whether appellant knew that plagiarism had occurred and ignored it. However, whether statements are verifiable is an issue entirely distinct from whether an author, in fact, verified the statements. *Sikora v. Plain Dealer Publishing Co.*, 8th Dist. No. 81465, 2003-Ohio-3218, 2003 WL 21419279, ¶ 20.

{¶ 37} Upon our review, we note that the Meyer–Bloemer report included references to data and documents that lent credence to the statements made therein. They referred to a four-month investigation during which they read and investigated various documents. They indicated that seven faculty members supervised theses in which plagiarism was found. They indicated that most of the plagiarism occurred in theses that were overseen by three faculty members.

They indicated that appellant "had the second highest incidences [sic] of plagiarism, 11 theses under his direction." They concluded that the plagiarism issue was limited to the Department of Mechanical Engineering after having "reviewed an additional 65 theses from 13 other disciplines across the campus." Finally, they provided: "Of the total 293 master theses completed in the department of Mechanical Engineering (according to the College's records), 106 or 36% were supervised by the two individuals who have been identified as the major contributors of the plagiarism problem in that department."

{¶ 38} Clearly, Meyer and Bloemer implied that they had first-hand knowledge of facts supporting the conclusions they reached. See *Mallory*, 2001 WL 1631329, citing *Condit v. Clermont Cty. Review* (1996), 110 Ohio App.3d 755, 759, 675 N.E.2d 475 (use of the phrase "from the information that was gathered" implies "undisclosed facts that would allow the statements to be verified"). The statements are nothing like the standardless statements in *Wampler*, which were incapable of objective proof or disproof. See *Wampler*, 93 Ohio St.3d at 129, 752 N.E.2d 962 ("description of Wampler's proposed rent as 'exorbitant,' much like his characterization of Wampler as 'ruthless,' and his distaste for Wampler's 'faceless,' 'mindless,' or 'heartless' corporate vendee, are standardless statements not amenable to objective proof or disproof"). Indeed, the Meyer–Bloemer report gives every indication that Meyer and Bloemer conducted a thorough investigation before reaching their conclusions. Because Meyer and Bloemer implied that they had first-hand knowledge of facts supporting their conclusions, the statements in the Meyer–Bloemer Report are verifiable. A reasonable reader would perceive them as such. This factor weighs in favor of actionability.

{¶ 39} Next, we consider the general context of the defamatory statements in the Meyer–Bloemer report. In this regard, we must examine more than just the defamatory statements in isolation to determine whether the "language surrounding the averred defamatory remarks may place the reasonable reader on notice that what is being read is the opinion of the writer." *Wampler* at 130. If the statements are contained within a letter that is meant to be a persuasive statement of the writer's opinion, then they are not actionable. See *Jorg v. Cincinnati Black United Front*, 153 Ohio App.3d 258, 2003-Ohio-3668, 792 N.E.2d 781, ¶ 21.

{¶ 40} In its review of the Meyer–Bloemer report, the trial court devoted most of its analysis to this factor. It cited the "flamboyant, emotional, and passionate phrases" demonstrating the authors' "tremendous pride in and loyalty to the university." It referred to the Meyer–Bloemer report as an "impassioned speech pleading for a return to the highest levels of academic integrity." The trial court perceived the report as a persuasive call to action, rather than a recitation of facts by investigators.

{¶ 41} Upon our review, Meyer and Bloemer clearly included emphatic, value-laden phrases that signify their passion about the issue of plagiarism at OU. The report conveys a message of anger, frustration, and self-righteousness. As a result, we believe that the tenor of the report is generally a provocative and persuasive call to action. However, this factor presents a closer call. The many references to the investigation and the supporting statistical data give the impression that a thorough investigation, which yielded impartial results, had occurred. We believe that these references limit the relative strength of this factor in our overall analysis. Stated differently, while we believe that the general context would generally suggest to a reasonable reader that the statements were the authors' opinions, we find that this factor provides less guidance in the ultimate fact-versus-opinion dichotomy. Although this factor weighs against actionability, the pull on this court's metaphoric compass is less pronounced.

{¶ 42} The final consideration regards the broader context of the statements at issue. In this regard, we must analyze "the broader social context into which the statement fits. Some types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." (Emphasis omitted.) *Wampler*, 93 Ohio St.3d at 134, 752 N.E.2d 962, citing *Ollman*, 750 F.2d at 983.

{¶ 43} With regard to this factor, the trial court found that Meyer and Bloemer were commenting on the situation, conveying their views to the provost, and suggesting corrective action. On appeal, appellant argues that the Meyer–Bloemer report was an investigative memorandum from Meyer and Bloemer to the provost and should be analyzed in that broader context. We believe that the focus of this factor requires a broader scope.

{¶ 44} In our view, a review of the broader context requires us to consider more in determining the perceptions of the reasonable reader. The reasonable reader would recognize the report as a response to the concern about plagiarism at OU. Indeed, the report essentially states this much. Additionally, while Meyer and Bloemer authored the report, it was OU that disseminated the report to the media. The reasonable reader could not ignore this fact. The reasonable reader would recognize how serious the allegations would be to an academic institution and its constituents. Krendl spoke to the gravity of the situation when she said:

> There was tremendous scrutiny of the investigation, there was tremendous scrutiny of the cases, there was regular phone calls, there were regular phone calls from the media asking us for updates, there were many, many contacts from outside constituents, including alumni, who were saying I don't understand what this means for my degree. I'm concerned about my own reputation. I'm concerned about the institution's reputation.

I can't say strongly enough how important the reputational issues for the institution were. \* \* \*

We believe that this goes without being said, and the reasonable reader would appreciate as much. However, not only did the allegations challenge the reputations of the university, its students, and its alumni, so too were the reputations of the members of the faculty at stake.

{¶ 45} As a result, it is reasonable to assume that a university's issuance of a press release in response to allegations of plagiarism would not be taken lightly. It is equally assumable that such a release would be carefully and deliberately crafted, rather than hastily thrown together. Finally, it is reasonable to assume that a university would refrain from issuing unfounded accusations and conclusions. We believe that all of these considerations would signify to the reasonable reader that what is being conveyed in the statements is factual. The broader context of the statements weighs in favor of actionability.

{¶ 46} Based upon the foregoing, the specific language, the verifiability, and the broader context of the statements all weigh in favor of actionability. The general context weighs against actionability but to a lesser degree. As a result, based upon our de novo consideration of the totality of the circumstances, we believe that the reasonable reader would perceive the statements in the Meyer–Bloemer report to be factual. The trial court erred when it concluded to the contrary.

## B. Dean Irwin's Statement

{¶ 47} We must apply the same totality-of-the-circumstances analysis to determine whether Irwin's statement conveyed his opinion or facts. Again, Irwin told a reporter for the Post that appellant had contributed to a culture of academic dishonesty. The trial court conducted no analysis of Irwin's statement before concluding that it was a protected opinion. In our analysis, we must consider the specific language, the verifiability, the general context, and the broader context.

{¶ 48} With regard to the specific language, the statement can hardly be interpreted as being other than pejorative: appellant contributed to the cheating that occurred. The specific language of Irwin's statement weighs in favor of actionability. With regard to its verifiability, Irwin implied that he had first-hand knowledge of facts supporting the conclusion he had reached. The verifiability of the statement weighs in favor of actionability. With regard to the general context, there is no surrounding language to analyze. We have no guidance in this regard. With regard to the broader context, Irwin made the statement to a reporter in response to questions about how OU handled the plagiarism scandal.

For the same reasons we provided with regard to the statements from the Meyer–Bloemer report, the broader context weighs in favor of actionability.

{¶ 49} For the foregoing reasons, Irwin's statement to a reporter for the Post was an actionable assertion of fact based upon the totality of the circumstances. The trial court erred when it determined otherwise.

{¶ 50} Based upon the foregoing, the trial court erred by reaching the legal conclusion that the statements at issue were constitutionally protected opinions. As a result, we sustain appellant's first assignment of error.

## 2. Manifest–Weight Challenges

{¶ 51} Appellant's third and fourth assignments of error present manifest-weight-of-the evidence challenges to the trial court's decision.

{¶ 52} "It is well-settled law that '[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *Sharp v. Norfolk & W. Ry. Co.* (1995), 72 Ohio St.3d 307, 313, 649 N.E.2d 1219, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; see also *Bryan–Wollman v. Domonko,* 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198, citing *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264. An appellate court must presume that the factual findings of the trial judge in a bench trial are correct since the trial judge had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. If the evidence is susceptible to more than one interpretation, we must construe it consistently with the trial court's judgment. *Cent. Motors Corp. v. Pepper Pike* (1995), 73 Ohio St.3d 581, 584, 653 N.E.2d 639.

## A. Burns's Statement

{¶ 53} It was alleged that Burns told Gray that appellant's contract for employment with OU had not been renewed "in part because Mehta supervised theses identified as containing plagiarism." Gray wrote an article in the Columbus Dispatch attributing that statement to Burns. During the trial, testimony was offered about what prompted Gray to include the statement in her article.

{¶ 54} Gray estimated that she had discussed the plagiarism scandal with Burns five or six times. Gray testified that she remembered speaking to Burns before writing the article. To the best of her recollection, Burns told her that appellant's contract was not renewed, in part, because he had supervised theses

in which plagiarism was found. According to Gray, she would not have included a statement to that effect in the article if Burns had not made such a statement. When questioned by appellee's counsel about whether the conversation could have been about OU's decision to merely relieve appellant of his advising duties, Gray said: "No. If that had been the case, that's what I would have written in the story."

{¶ 55} During Burns's testimony, he deferred to Gray with regard to the number of times they had discussed the plagiarism scandal because he had spoken with many members of the media from all over the country. He testified that he could not remember the specific conversation that prompted the publication of the article. However, after contemplating what might have been said, he testified that he did not believe he made the statement because it was not truthful: "I don't believe I did. * * * Because it wasn't right. It wasn't true."

{¶ 56} When presented with these competing positions on the factual issue of whether Burns made the statement, the trial court found that nothing in Burns's demeanor suggested that his testimony lacked credibility. It further held that it was unlikely that legal counsel for OU would make such a statement. As a result, the trial court concluded that there was insufficient evidence demonstrating that Burns had made the statement.

{¶ 57} Upon our review, we note that Burns's testimony regarding the matter was certainly based upon deduction and supposition. However, so too was the testimony of Gray. According to Burns, because the statement was untruthful, he did not make it. According to Gray, however, because she included it in her article, Burns did make the statement. Because we must defer to the finder of fact on credibility determinations, we find that the record contains some competent, credible evidence supporting the trial court's decision. The trial court's conclusion regarding Burns's statement was not against the manifest weight of the evidence. We therefore overrule appellant's fourth assignment of error.

## B. Other Purported Findings

{¶ 58} In his third assignment of error, appellant challenges other portions of the trial court's decision. Specifically, he raises issue with what he perceives as four different findings of fact reached by the trial court. Upon our review, however, the trial court was not making findings of fact in the portions of the decision with which he raises issue. Indeed, just as we outlined the testimony to set the stage for the legal dispute in our decision, so too did the trial court in its decision. Unlike the scenario raised in his fourth assignment of error, where the trial court clearly chose amongst competing positions on a disputed factual issue, appellant's third assignment of error challenges the trial court's summary of the testimony and arguments presented. In this regard, appellant deconstructs

various sentences from the trial court's decision. To the extent that appellant presents a manifest-weight challenge to purported findings of fact, which we do not believe the trial court rendered, we overrule appellant's third assignment of error.

### 3. Public–Records Request

{¶ 59} By way of appellant's second assignment of error, he challenges the trial court's finding that OU's publication of the report was not actionable as a matter of law because it was disseminated in response to a public-records request. He argues that no Ohio court has recognized such blanket immunity for statements irrespective of content. He argues that the trial court granted a license to defame that cannot be upheld.

{¶ 60} On the other side, appellee argues that the trial court's holding was much narrower than appellant suggests. It argues that the trial court's reference to the public-records issue was merely its way of finding that actual malice was lacking.

{¶ 61} Upon our review, the trial court began its analysis by noting that the dissemination occurred in response to a pending public-records request. It then cited authority indicating that an investigatory report of a public employee is a public record. As a result, it then held that the "publication was not actionable, as a matter of law."

{¶ 62} We read the trial court's decision as appellant does. Moreover, so too does appellee. Through the briefing before this court, appellee openly acknowledges the fact that the trial court never considered the issue of actual malice. Nevertheless, appellee attempts to frame the trial court's analysis of the public-records issue in this light.

{¶ 63} Certainly, there are instances in which portions of public records are not subject to disclosure. See *State ex rel. Cincinnati Enquirer v. Jones–Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10 (Ohio Public Records Act "excepts from disclosure '[r]ecords the release of which is prohibited by state or federal law'"); see also *United States v. Miami Univ.* (C.A.6, 2002), 294 F.3d 797, 811, citing R.C. 149.43(A)(1)(v) ("Ohio Public Records Act does not require disclosure of records the release of which is prohibited by federal law"). Indeed, the Ohio Public Records Act allows for redactions for certain content and also sets definitional parameters regarding what constitutes a public record. See R.C. 149.43. Upon conducting our own research, we concur with appellant's position that there is no legal authority in Ohio providing for blanket immunity from defamation for any and all content included within a public record. Moreover, appellee has failed to provide any reasons why we should create such an authority

based upon the circumstances of this matter. As a result, we sustain appellant's second assignment of error.

### 4. Contingent Cross–Assignment of Error

{¶ 64} As a procedural matter, appellee has raised a contingent cross-assignment of error, which is the subject of appellant's motion to dismiss and motion to strike. In this contingent cross-assignment of error, appellee argues that the statements at issue regarded a matter of public concern. As a result, appellee argues that appellant had the burden of proving that OU acted with actual malice or that appellant suffered actual injury. Further, appellee argues that appellant failed to meet his burden, and we must affirm even after concluding that the statements at issue were factual in nature.

{¶ 65} The issues of actual malice and actual injury hinge on factual determinations that were never made by the trial court. Indeed, given the trial court's conclusion that the statements at issue were constitutionally protected opinions, consideration of these issues never became necessary. Similarly, it was also unnecessary to consider other defenses that may potentially be available to appellee.

{¶ 66} Because consideration of appellee's contingent cross-assignment of error would require this court to determine, for the first time, a number of factual issues, we will refrain from addressing these issues for the first time herein. See *Allstate Ins. Co. v. Campbell*, 10th Dist. No. 09AP–306, 2009-Ohio-6055, 2009 WL 3823362, ¶ 57 (appellate courts ordinarily refrain from addressing arguments that were never decided by the trial court); see also *Crestmont Cleveland Partnership v. Ohio Dept. of Health* (2000), 139 Ohio App.3d 928, 935, 746 N.E.2d 222, citing *State ex rel. Pitz v. Columbus* (1988), 56 Ohio App.3d 37, 45, 564 N.E.2d 1081; see also *Bowen v. Kil–Kare, Inc.* (1992), 63 Ohio St.3d 84, 89, 585 N.E.2d 384.

{¶ 67} As a result, we conclude that appellee's contingent cross-assignment of error is not yet ripe, and we remand the matter for consideration of these and other issues. Our resolution of appellee's contingent cross-assignment of error renders moot appellant's motion to dismiss and motion to strike.

### 5. Conclusion

{¶ 68} Based upon the foregoing, the statements at issue were not constitutionally protected opinions. Accordingly, we sustain appellant's first assignment of error. It was also error for the trial court to have concluded that the publication of the Meyer–Bloemer report was not actionable as a matter of law. We therefore sustain appellant's second assignment of error. However, the trial court's findings were not against the manifest weight of the evidence. We accordingly overrule appellant's third and fourth assignments of error. We

decline to address for the first time issues not previously addressed by the trial court and accordingly conclude that appellee's contingent cross-assignment of error is not yet ripe, which renders moot appellant's motion to dismiss and motion to strike. We therefore affirm in part and reverse in part the judgment of the Court of Claims of Ohio and remand this matter for further proceedings in accordance with law and consistent with this decision.

Judgment affirmed in part
and reversed in part
and cause remanded;
contingent cross-assignment
of error overruled;
and motion to dismiss and motion to strike
rendered moot.

BRYANT, P.J., and SADLER, J., concur.