[Cite as *Mehta v. Ohio Univ.*, 2012-Ohio-3677.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

BHAVIN MEHTA, PH.D.

    Plaintiff

    v.

OHIO UNIVERSITY

    Defendant

Case No. 2006-06752

Judge Joseph T. Clark

<u>DECISION</u>

{¶ 1} On August 18, 2009, after a trial on the issue of liability, the court rendered judgment in favor of defendant. See *Mehta v. Ohio Univ.*, Ct. of Cl. No. 2006-06752, 2009-Ohio-4699 (*Mehta I*). On July 14, 2011, the Tenth District Court of Appeals issued a judgment entry remanding the case for further proceedings consistent with its July 14, 2011 decision affirming, in part, and reversing, in part, this court's August 18, 2009 decision. See *Mehta v. Ohio Univ.,* 194 Ohio App. 3d 844, 2011-Ohio-3484 (10th Dist.) (*Mehta II*). By agreement of counsel, and with consent of the court, the parties filed simultaneous briefs regarding the outstanding issues upon remand and the court heard oral arguments on December 2, 2011.

{¶ 2} The relevant facts of this case were set forth by the court of appeals in *Mehta II*, supra, as follows:

{¶ 3} The facts of this matter stem from a highly publicized plagiarism scandal that plagued the Russ College of Engineering and Technology at OU ("Russ College"). At the time, Mehta was employed as an Associate

Professor of Russ College and was the Director of OU's Computer-Aided Design/Computer-Aided Manufacturing Laboratory. One of his responsibilities was to advise graduate students in their researching and writing of theses and dissertations.

{¶ 4} In July 2004, a mechanical engineering graduate student raised issue with what he perceived as plagiarism in portions of theses from within the Department of Mechanical Engineering in the Russ College. The allegations eventually reached the Dean of the Russ College, Richard Dennis Irwin ("Dean Irwin"), and the Provost of OU, Kathy Krendl ("Provost Krendl"). * * *

{¶ 5} Dean Irwin approached Provost Krendl and recommended they establish an Academic Honesty Oversight Committee ("AHOC") to investigate the allegations. As a result, in November 2005, AHOC was established and was solely comprised of department chairs from the various disciplines of engineering within the Russ College. AHOC was asked to determine if plagiarism had occurred and to provide recommendations regarding the accountability of the students and the faculty.

{¶ 6} In the midst of AHOC's investigation, Provost Krendl sought a perspective from outside of the Russ College. Therefore, in February 2006, she created a two-person committee consisting of Gary Meyer ("Meyer") and Hugh Bloemer ("Bloemer"). Neither individual had any affiliation with the Russ College. * * *

{¶ 7} On March 30, 2006, AHOC issued a report setting forth its recommendations. This report did not conclusively determine that plagiarism had, in fact, occurred. It did, however, establish a series of guidelines to categorize the type and relative degree of alleged plagiarism in the theses and dissertations.

{¶ 8} * *

{¶ 9} Meyer and Bloemer received a copy of the AHOC report and continued their investigation. In late May 2006, Meyer and Bloemer provided

a draft of their report ("Meyer-Bloemer Report") to Provost Krendl and Dean Irwin. Upon receiving the draft, Dean Irwin approached Provost Krendl and expressed concerns over what he classified as inflammatory and inappropriate content. He indicated that he would not support her in the event she wished to release it to the media during a press conference that was scheduled for May 31, 2006. According to the provost, she approached Meyer and Bloemer and asked them to change the draft and tone down its content. They refused. Nevertheless, on May 31, 2006, Provost Krendl held the press conference during which she distributed the unaltered draft of the Meyer-Bloemer Report to the media.[1] Id. at ¶2-8.

{¶ 10} The following language from the Meyer-Bloemer Report has been identified by plaintiff as defamatory: "faculty members who either failed to monitor the writing in their advisees' theses or simply ignored academic honesty, integrity and basically supported academic fraudulence;" and that faculty "blatantly [chose] to ignore their responsibilities by contributing to an atmosphere of negligence toward issues of academic misconduct in their own department."

{¶ 11} The third statement at issue was made by Dean Irwin and published in The Post, a publication in Athens, Ohio. Dean Irwin told the reporter that the faculty members referenced in the report were relieved of their advising responsibilities because they had contributed to a culture of academic dishonesty. Dean Irwin identified

---

[1]The Meyer-Bloemer Report provides in relevant part:

"According to the documents that we read and investigated, there are seven faculty members in the department who supervised theses where plagiarism was found. However, the vast majority of the cases revolve around three faculty members who either failed to monitor the writing in their advisees theses or simply ignored academic honesty, integrity and basically supported academic fraudulence. * * *

"We are appalled that three members of the faculty in mechanical engineering have so blatantly chosen to ignore their responsibilities by contributing to an atmosphere of negligence toward issues of academic misconduct in their own department. * * *

"We recommend that, consistent with Ohio University policy, you initiate the dismissal of the current chair of the department immediately, start the process of rescinding the title of Moss Professor and dismiss the Group II faculty member, who had the second highest incidences of plagiarism, 11 theses under his direction." *Mehta II*, supra, at ¶8.

The court of appeals noted that "[a]lthough not specifically named within the report, Mehta was the only 'Group II faculty member' employed in the Department of Mechanical Engineering at that time." Id.

plaintiff as one such faculty member. The Post subsequently released an article indicating that members of the faculty had contributed to a "culture of plagiarism."

{¶ 12} The court of appeals held that this court erred when it ruled that the statements made both in the Meyer-Bloemer Report and in Dean Irwin's interview with The Post, where statements of opinion which were not actionable under Ohio law. Id. at ¶46. The court of appeals also held that this court erred when it determined that the statements made in the Meyer-Bloemer Report were not actionable, as a matter of law, inasmuch as such statements were published in response to a public records request. Id. at ¶63.

{¶ 13} Defamation is the publication of a false statement "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council*, 73 Ohio St.3d 1, 7, 1995-Ohio-66. Under Ohio common law, actionable defamation falls into one of two categories: defamation per se or defamation per quod. To be actionable per se, the allegedly defamatory statement must fit within one of four classes: "(1) the words import a charge of an indictable offense involving moral turpitude or infamous punishment; (2) the words impute some offensive or contagious disease calculated to deprive a person of society; (3) the words tend to injure a person in his trade or occupation; and (4) the words tend to subject a person to public hatred, ridicule, or contempt." *Am. Chem. Soc. v. Leadscope, Inc.*, 10th Dist. No. 08AP-1026, 2010-Ohio-2725, ¶49, citing *Schoedler v. Motometer Gauge & Equip. Corp.,* 134 Ohio St. 78, 84 (1938). Defamation per se occurs if a statement, on its face, is defamatory. Id.

{¶ 14} "When a statement is defamatory per se, a plaintiff may maintain an action for defamation and recover damages, without pleading or proving special damages. In other words, in cases of defamation per se, the law presumes the existence of damages. When, however, a statement is only defamatory per quod, a plaintiff must plead and prove special damages." (Internal citations omitted.) Id. at ¶51.

{¶ 15} In determining whether the statements in the Meyer-Bloemer Report were statements of opinion or of fact, the court of appeals stated: "While there is no direct statement that [plaintiff] failed to perform the duties as an advisor, the clear impact of the specific language imparts this assertion. * * * We believe a reasonable reader would perceive the specific language as an assertion that [plaintiff] failed to perform his duties as an advisor. That is, [plaintiff] either failed to perform his duties by failing to detect the plagiarism, or he failed to perform by detecting the plagiarism and ignoring it. Either way, what remains is the pejorative implication that [plaintiff] failed to perform his advisory duties. * * * This analysis applies equally to the specific language of the second challenged statement in the Meyer-Bloemer Report." *Mehta II*, supra, ¶34.

{¶ 16} Based upon the analysis of the court of appeals, the court finds that the statements of fact contained in the Meyer-Bloemer Report, if proven untrue, are libelous per se inasmuch as the words tend to injure plaintiff in his occupation as a college professor. Consequently, should plaintiff prove that the statements are untrue, plaintiff may recover without proof of actual loss or damage.

{¶ 17} With respect to the Irwin statement, such an inference is less obvious. Although the court of appeals referred to the statement as "pejorative," the court did not conclude that the statement necessarily injured plaintiff in his occupation. Nevertheless, the court finds that, given the context in which the statement was made, the inference that plaintiff "contributed to the cheating that occurred," tends to harm him in his occupation as a college professor. Accordingly, Dean Irwin's statement to The Post, if proven untrue, is also defamatory per se.

{¶ 18} Turning to the critical issue of truthfulness, plaintiff argues that his established process for teaching proper citation and attribution, monitoring students' work, and reviewing graduate theses comports with defendant's "established standards and expectations of faculty members," and that the implication that he did not uphold such standards is false. Plaintiff maintains that the plagiarism occurred "despite his diligent monitoring, not because of negligence on his part," and that the implication that he "contributed to the cheating" is false. (Plaintiff's Brief on Remand.)

{¶ 19} In support of his argument, plaintiff presented his own testimony and the testimony of his expert, Dr. Patrick Scanlon. The testimony was summarized in this court's August 18, 2009 decision as follows:

{¶ 20} Dr. Patrick Scanlon, [is] the writing director in the Department of Communication at the Rochester Institute of Technology. Dr. Scanlon defined plagiarism as the deliberate use of someone else's ideas expressed as one's own without proper attribution. According to Dr. Scanlon, plagiarism requires a finding of an attempt to deceive the reader by not directing the reader to the original source. Dr. Scanlon described three primary ways for the faculty advisor to detect plagiarism: 1) the faculty member may recognize text that is not attributed; 2) the faculty member may notice an abrupt change in the writing style; and 3) the faculty member may encounter irregularities in the document such as awkward transition, duplication, or internal inconsistencies.

{¶ 21} * *

{¶ 22} Plaintiff testified that he instructed his students always to cite the author when they included non-original work in their theses, with the exception that unpublished collaborative work could be copied verbatim and that the student need not attribute to a source any formulas, figures, or text, if such were considered common knowledge. Plaintiff admitted that he directed four of his students to copy text in each of their theses without identifying such as a report that summarized work produced from a group effort. Plaintiff also encouraged his advisees to seek assistance from senior students who had already worked on similar projects. According to plaintiff, using collaborative work without attribution and including background material from textbooks without citation to the source does not constitute plagiarism. Plaintiff further testified that it was not his custom or practice to check for or to verify citations. Although plaintiff scheduled only one hour per week to meet with his group of advisees, he testified that he relied on having an 'open door policy' for students to seek further assistance. Plaintiff

testified that he received chapters periodically from each graduate student and that when he received the completed draft thesis he would read it, make comments or corrections, and return the edited version to the student to complete any revisions. In contrast to the opinion offered by Dr. Bloemer, plaintiff stated that he did not believe that he should be held accountable for instances of duplication, copying, or outright plagiarism committed by his students. *Mehta I*, supra, ¶24-27.

{¶ 23} Defendant presented the testimony of Dr. Robert Williams, a professor of mechanical engineering, Dr. Meyer and Dr. Bloemer. The court summarized the testimony of these witnesses in the August 18, 2009 decision as follows:

{¶ 24} Gary Meyer testified that he teamed with Hugh Bloemer at the direction of the provost and that they both reviewed the text of select student theses which they had obtained from the OU library. Meyer stated that they did not interview the students or their faculty mentors. Based upon what he perceived as an extensive amount of duplication, Meyer concluded that plaintiff had supported fraudulence by his failure to detect or recognize duplication. Meyer acknowledged that there had been conflicts between plaintiff and himself prior to 2004 concerning plaintiff's attempts to obtain approval for certain contracts and other research projects. Meyer stated that the provost never asked if he had any potential conflict of interest before assigning him to investigate the alleged cheating. Meyer maintained that Bloemer wrote the report; he merely edited the text and he specifically denied ever speaking to members of the press about the matter. Meyer also denied being asked by the provost to revise the report. Meyer reiterated that in his opinion plaintiff neglected to fulfill his duty as a mentor by his failure to detect any instance of plagiarism that was later found in the completed theses of plaintiff's own advisees. Thus, Meyer opined that such negligence was tantamount to condoning and even encouraging plagiarism. According to Meyer, the primary advisor should be held accountable for

citation errors or omissions in his student's work product, and that he considers even a single incident of plagiarism to be significant.

{¶ 25} * *

{¶ 26} [Dr. Williams] testified that he had been employed at OU for 13 years and that he had served as an advisor for students completing theses at the masters and Ph.D. levels. He explained that a faculty graduate student advisor is expected to help the students select a research topic and that the advisor has ultimate oversight for each advisee's thesis. Dr. Williams further explained that in the mechanical engineering department it is accepted practice for the introductory section of a student's thesis to contain historical or background material that is not the student's original work. Nevertheless, the student should place a number in brackets as close in the text to the copied or quoted material as possible, and the corresponding references are numbered in a list of citations placed at the end of the thesis, in the order that they appear in the text. Williams stated that prior to 2005 OU did not have computer software available to assist in the detection of plagiarism. However, he maintained that it was his custom and practice to review the theses for his advisees specifically for proper citation form and that he expected to find proper citations.

{¶ 27} Dr. Bloemer testified that, in his opinion, plagiarism had occurred and he referenced instances of widespread copying that at times included whole chapters copied from textbooks, and other examples where source material was duplicated but not attributed. Dr. Bloemer further testified that, in his opinion, duplication without attribution equals plagiarism. Likewise, he opined that material used in common must identify the group's contribution; otherwise the author commits plagiarism. According to Dr. Bloemer, a faculty member is always to be held accountable if a student commits plagiarism. Dr. Bloemer contends that plagiarism occurred in theses that were prepared under plaintiff's direction and that they were subject to his review. Therefore, Dr. Bloemer maintains that, in his opinion,

plaintiff is accountable for the content, including the plagiarism. *Mehta I*, supra, ¶23-26.

{¶ **28**} In reviewing the above referenced testimony, this court concluded that "the term plagiarism means different things to different people," but that "a faculty member who mentors graduate students has a responsibility to ensure that the thesis is properly supported and that such duty includes proper attribution for non-original work." Id. at ¶29. The court further concluded that the Department of Mechanical Engineering should be held to the same academic standards as other departments and colleges within the university, and that a lower standard does not apply to the department with regard to what constitutes plagiarism. Additionally, this court rejected plaintiff's narrow definition of plagiarism and specifically found that "plaintiff lacks insight into the academic standards relied upon and espoused in the Meyer/Bloemer report." Id. These findings and conclusions were not reviewed by the court of appeals and remain undisturbed for purposes of remand.

{¶ **29**} Based upon the court's prior findings and conclusions and, reviewing the trial testimony in the context of the decision from the court of appeals, it is clear to the court that plaintiff failed to perform an important aspect of his duties as a graduate mentor. Specifically, he did not competently review the written work product of his advisees in a manner which was reasonably calculated to detect plagiarism. The fact that plaintiff lacks insight into prevailing academic standards and that his understanding of plagiarism differs from that of his colleagues, no doubt, contributed to this failure. The court further finds that plaintiff's overly burdensome work schedule was a contributing factor.

{¶ **30**} Plaintiff counters that the alleged defamatory statements are false inasmuch as he has proven that his instruction of students was well within the standards set by the mechanical engineering department, including his teachings on the issues of plagiarism and academic integrity. However, as noted in the court of appeals decision, the criticism of plaintiff in the Bloemer/Meyer report focuses on his negligent failure to detect numerous, serious instances of plagiarism occurring in the theses of students under his mentorship. Consequently, even if the court were to accept plaintiff's

representation that he taught his students proper attribution and citation and that he carefully read each of the theses presented to him for review, the fact remains that plaintiff failed to detect an overwhelming number of instances of improper citation, failures of proper attribution, and even verbatim copying without attribution. Plaintiff has admitted that he did not check a single citation in any student theses.

{¶ 31} The evidence is clear that preventing plagiarism is part of plaintiff's duties, regardless of how the term "plagiarism" is defined or whether plaintiff believes he is responsible for detecting it. The evidence leaves little doubt that plaintiff did not take reasonable steps to detect plagiarism in the theses of his student advisees. Thus, even if his teachings on the subject of academic integrity had been flawless, plaintiff did not follow up on such efforts by adequately monitoring student compliance. While the language used in the report is, in the court's opinion, unnecessarily inflammatory, the level of culpability attributed to plaintiff is merely negligence. The statements do not permit the inference of intentional conduct on the part of plaintiff.

{¶ 32} In short, plaintiff has not persuaded the court that the statements in the Meyer/Bloemer report were false.

{¶ 33} The same can be said of the statement attributed to Dean Irwin. The court of appeals opined that Dean Irwin's statement "can hardly be interpreted in any way besides being pejorative: [plaintiff] contributed to the cheating that occurred." *Mehta II*, supra, ¶48. Dean Irwin testified convincingly regarding his intended message when he spoke to the reporter at The Post:

{¶ 34} I think the statement was really a culture of academic dishonesty. And what I really mean by that is probably sort of best given by a hypothetical. And that is you have a situation where a student has been - has cheated and has gotten away with it. That happens. But then another student may find out about it. And if there are no controls by the faculty mentor to prevent that second student from doing it and getting away with it, then there might be a third and then there may be a forth. It becomes known after a while among the students in their work groups that it is possible for this to happen, and I think that proper care in proofing these

documents and helping in their development goes a long way, it's not foolproof, but it goes a long way toward preventing a pattern of cheating. As noted above, the evidence shows that plaintiff was negligent with respect to his mentoring activities and that such negligence resulted in plagiarism. Thus, plaintiff was a contributing factor in the cheating that occurred. (Liability Trial Transcript, page 898.)

{¶ 35} The evidence establishes plaintiff's failure to competently perform his mentoring duties contributed to the plagiarism that occurred. Dean Irwin's statement implies negligence only. Accordingly, the statement is true.

{¶ 36} Based upon the foregoing, the court finds that plaintiff has failed to prove that the alleged defamatory statements were false. Having so found, the court concludes that plaintiff has failed to establish a critical element of his claim against defendant. Accordingly, judgment shall be entered in defendant's favor.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

BHAVIN MEHTA, PH.D.

     Plaintiff

     v.

OHIO UNIVERSITY

     Defendant

Case No. 2006-06752

Judge Joseph T. Clark

JUDGMENT ENTRY

{¶ 37} On August 18, 2009, this court issued a judgment in favor of defendant. On July 14, 2011, the Tenth District Court of Appeals affirmed, in part, and reversed, in part, the judgment of this court and remanded the case for further proceedings.

{¶ 38} In accordance with the decision filed concurrently herewith, judgment is hereby rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

 

 

_____
JOSEPH T. CLARK
Judge

cc:

Barbara A. Terzian
Frederick M. Gittes
Kathaleen B. Schulte
723 Oak Street
Columbus, Ohio 43205-1011

Daniel R. Forsythe
Randall W. Knutti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

006
Filed March 6, 2012
To S.C. reporter August 15, 2012